Peter F. Loftus v. Commissioner.
Loftus v. Commissioner
Docket No. 617.
United States Tax Court
1944 Tax Ct. Memo LEXIS 112; 3 T.C.M. (CCH) 974; T.C.M. (RIA) 44307; September 20, 1944
*112 Robert A. Rundle, Esq., for the petitioner. Homer F. Benson, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: By this proceeding petitioner challenges portions of deficiencies of $1,853.90 and $1,757.56 determined in his income tax for the years 1939 and 1940, respectively. The sole question presented is whether petitioner and his wife conducted a business as a partnership recognizable as such for income tax purposes during the years in question. Findings of Fact Peter F. Loftus, petitioner, is an individual residing at 54 Roycroft Avenue, Mt. Lebanon, Pittsburgh, Pennsylvania. Mary H. Loftus is his wife. Separate income tax returns were filed by them for the calendar years 1939 and 1940. For some seven years prior to 1922 petitioner had been employed as an engineer by a group of mills in northern New York State. These mills owned mining properties in Pennsylvania. In the course of his work petitioner visited the mining area on several occasions. On the advice of friends and his wife he decided in 1922 to move to the Pennsylvania mining region and go into the engineering business for himself. At the time he made this decision his wife agreed *113 that she would, at least at the start, handle the office work connected with the business. In 1922 petitioner and his wife moved to Timblin, Pennsylvania, and there a business was started in the name of "Peter F. Loftus, Consulting Engineer." Capital necessary to embark on this business was obtained from the sale of household furnishings which petitioner and his wife had had prior to moving to Pennsylvania, and which netted the sum of $1,500; from a joint bank account of petitioner and his wife in the amount of $1,000; and from the personal savings of Mrs. Loftus in the amount of $400 or $500. This money was used to purchase engineering equipment for use in the business. The office used in Timblin, selected by Mrs. Loftus, was one room of the apartment in which petitioner and his wife lived at that time. The business in Timblin consisted largely of performing engineering services for mines in that area. The services were performed on a continuing contractual basis. Petitioner was out of the office approximately 75 percent of the time and sometime after the business had started had two assistants working with him. During the years in Timblin petitioner was trying to familiarize himself *114 with the electrical mechanical problems of mining. The business continued to operate in Timblin for three years and during that entire time Mrs. Loftus was in charge of the office. The office work performed by Mrs. Loftus in Timblin consisted of typing letters, placing orders for replacement parts, filing, typing inspection reports, taking care of accounts, talking to clients and putting them in touch with petitioner who was frequently out of the office and not available by telephone. During the years at Timblin Mrs. Loftus worked in the office practically all day and sometimes in the evening. In 1925 the business moved to Brookville, Pennsylvania, and opened offices which had been selected by petitioner and his wife. The business continued to be operated under the name of "Peter F. Loftus, Consulting Engineer." While the business continued the engineering service to the mines, it also started making power and industrial studies for various private utilities. During this period another engineer was brought in to assist petitioner. For the first two and a half to three years at Brookville petitioner's wife worked in the office alone, doing the same kind of work she had done at Timblin. *115 After that time she obtained a girl to help her in the office. In the years at Brookville Mrs. Loftus worked from 8 a.m. to 6 p.m. and at times continued her work at night. In 1929 the business expanded and petitioner went to Pittsburgh in the fall of that year to open an office there. From that time to the fall of 1930 offices were maintained in both Brookville and Pittsburgh. Very little work was being done out of the Brookville office at that time and it was kept open only for the convenience of certain clients in that area who desired to make appointments with petitioner or secure other information. During the year that the Brookville office operated while petitioner was in Pittsburgh, Mrs. Loftus was in sole charge there. Contracts performed at Brookville were of the same continuing nature as they had been at Timblin. In the fall of 1930 the Brookville office was closed and the business operated solely in Pittsburgh in offices selected by petitioner and his wife. At this time the name of the business was changed to "Peter F. Loftus. Consulting Engineers." The business expanded in Pittsburgh into a consulting engineering organization employing electrical, mechanical, structural, *116 chemical, and civil engineers. Engineering services were performed for municipalities, public utilities, corporations, industrials, and commercial groups. In general the business was one of a consulting engineering organization. Field studies were made for clients and upon completion reports were made assembling the data obtained. These reports varied in length from one to ten volumes of 500 pages per volume and contained, in addition to the engineering data, conclusions drawn therefrom and recommendations made to the client in summary form. During the years 1930 through 1940, approximately 120 of these reports were made, some 14 of them being made in the years in question, 1939 and 1940. During the years the business was operated in Pittsburgh, Mrs. Loftus continued to perform services which were not, however, identical with the services she had performed in Timblin and Brookville. At Pittsburgh her services were more of an administrative nature and she no longer performed the actual clerical work which she had previously done. She proofread all the reports turned out by the business and criticized them from the standpoint of form, clarity, and grammatical construction. Mrs. Loftus *117 had no knowledge of engineering and no qualifications to criticize the reports from an engineering or technical standpoint. Petitioner liked the opinions of Mrs. Loftus as to the clarity and form of the conclusions and recommendations made in the reports, for he felt that if she could not understand them, neither could the clients for whom they were intended and vice versa. In addition to her work on reports Mrs. Loftus discussed with petitioner every contract entered into or considered by the business as well as fees to be charged. Petitioner felt that her advice in these matters was valuable because of her long experience in the business and her knowledge of past mistakes. In addition, during the Pittsburgh years Mrs. Loftus met new personnel and discussed with petitioner the question of hiring them. She also did promotional work and was in charge of the advertising of the business. The advertising consisted of annually sending greeting cards to all old, new, and potential clients. As many as 2500 business cards were sent out a year. In addition, Mrs. Loftus kept in touch with old clients, frequently saw them and joined with her husband in business discussion with them. Another *118 service performed by Mrs. Loftus was to check bills coming to the business to determine which were personal and which were those of the business. During the years in Pittsburgh a safe deposit box was maintained in the joint names of petitioner and his wife. In this was kept personal property of each of them and property belonging to the business. Mrs. Loftus had access to the box and at time removed securities therefrom and pledged them for loans to the business. Mrs. Loftus was at all times familiar with the work being done by the business. At a time when petitioner was interested in buying a building in Pittsburgh, she discouraged him and as a result of their joint decision the purchase was not made. During the years in Pittsburgh Mrs. Loftus' services to the business took less of her time than they had in Timblin or Brookville. She worked on an average of four hours a day three or four days a week in Pittsburgh. This was less time than she had devoted to the business in Timblin or Brookville. After 1938 the character of the business changed and reports were more or less secondary. It was an expanded business and engineering design and construction became predominant. In the years *119 in question Mrs. Loftus performed substantially the same services as she had performed in Pittsburgh prior to that time. Because of the increase in the size of the business, however, the scope of her work was larger and she had more responsibility even though she worked fewer hours. During these years she worked some four hours a day and was in the office an average of three or four days a week. In addition, she frequently worked at home at night with petitioner's personal secretary, and this occurred regardless of whether or not petitioner was present. On such occasions Mrs. Loftus and petitioner's secretary discussed reports, personnel, advertising, and other work being done by the business. They discussed the problem of what work should be done in the office on the succeeding day, and decisions were made as to which work should have precedence. Petitioner was not available for business in the office 92 days in 1938; 121 days in 1939; and 214 days in 1940. When difficult problems arose in the business during his absence they would sometimes be referred to Mrs. Loftus for her opinion. During petitioner's absence Mrs. Loftus would occasionally seek his advice on business problems *120 via the telephone. Mrs. Loftus had no separate office at the firm's place of business in Pittsburgh. During the years 1922 through 1938 the business was at all times held out to the public as a sole proprietorship with petitioner being the sole proprietor. During all those years all contracts entered into by the business were signed by petitioner. Profits from the business were deposited during the years 1922 through 1938, in a checking account in the name of petitioner. All checks on it were signed by him. Some of these profits were used as additional capital in the business, and other were invested in non-registered securities that were kept in a safe deposit box in the joint names of petitioner and his wife. Out of the earnings of the business in these years petitioner acquired a residence and some $100,000 of securities which he regarded as his personal property. These assets were not included in the 1939 assignment (described below) by petitioner to his wife. Prior to 1939 they were carried as assets on the books of the company. When either petitioner or his wife desired cash petitioner would write checks on the account. Certain of the profits from the business were used by *121 Mrs. Loftus to purchase insurance on petitioner's life. Mrs. Loftus received such funds by requesting them from petitioner. Mrs. Loftus received no salary from the business during the years 1922 through 1938, and no other money "from the partnership." In the years 1932, 1936, and 1938, joint income tax returns were filed by petitioner and his wife. In the early years capital was needed in the business for the purchase and maintenance of testing instruments and other equipment. Later, as the business expanded, capital was needed to meet overhead while work was being performed on long-term contracts which called for payment for services rendered only on completion thereof. At the time of the hearing the business employed some 25 persons, 20 of whom were engineers, and the business then had a net worth of approximately $210,000. At the time of the hearing overhead expenses amounted to between $15,000 and $18,000 per month. During the years 1922 to January 1, 1939, petitioner and his wife understood as between themselves that the business was a joint venture and that they were partners therein. At one time in Brookville petitioner told Samuel Wallwork that Mrs. Loftus was his partner *122 in the business. In 1929, petitioner and his wife had discussed forming either a partnership or a corporation with a view to obtaining additional working capital. A sizeable fee received at that time, however, obviated the necessity for such a change and none was made. In 1938 the business entered into a contract with the City of Cleveland, the contract providing that upon petitioner's death all work completed up to that time should be turned over to the City. In return the contract was to cease and petitioner's estate to be paid a share of the contract price proportionate to the work completed up to that time. This termination clause of the contract was inserted on the insistence of the Director of Law of the City of Cleveland who had objected to the signing of a contract without such a provision. The undertaking called for by the contract necessitated the hiring of additional personnel and the assumption of certain long-term commitments. The termination of the contract by petitioner's death might have resulted in serious financial loss. Desiring to continue to do such work but at the same time avoid the risk inherent in termination clauses, petitioner after discussions with his *123 wife, determined to form a legal partnership with her. Petitioner in 1938 advised his auditor and his attorney of his desire to form a partnership and instructed them to draw up and prepare the necessary papers. In his discussions with his wife and advisers relative to the formation of the partnership tax saving considerations were were not mentioned. Several drafts of a partnership agreement were submitted to petitioner and his wife but, because they appeared too complicated, were rejected. Finally a draft was prepared in the early part of 1939 and it was executed in the latter part of that year, stating, however, that it was to be effective as of January 1, 1939. The partnership agreement provided: "PARTNERSHIP AGREEMENT" "MADE the Third day of January, 1939, by and between PETER F. LOFTUS, of the Township of Mt. Lebanon, Allegheny County, Pennsylvania, hereinafter called the 'First Party,' AND "MARY H. LOFTUS, of the same place, hereinafter called the 'Second Party.' "WHEREAS, the parties, husband and wife, are desirous of forming a partnership with their respective contributions to capital for the purpose of conducting a business of consulting engineering, substantially *124 of the character heretofore conducted solely by the First Party. "NOW, THEREFORE, THIS AGREEMENT WITNESSETH that for and in consideration of the premises and of their respective covenants hereinafter set forth, the parties hereto agree as follows: "1. The parties hereby form a partnership for the purpose of conducting a business of consulting engineering under the firm name, 'PETER F. LOFTUS, CONSULTING ENGINEERS.' "2. The business shall be conducted from the suite of office at No. 632 Oliver Building, Pittsburgh, Pennsylvania, or from such other location as may hereafter be agreed upon between the parties. "3. The First Party shall be the active manager of said business, assuming the principal responsibility for the conduct thereof, the keeping of adequate records and the making of all necessary reports and tax returns in connection therewith, and the Second Party shall render such services to said business as the First Party may reasonably, from time to time, require. The First Party shall be entitled, out of the first profits of said business, to an allowance of $6.00 per hour for all time actively spent by him in the management or conduct of said business, and thereafter the *125 parties shall be entitled to participate equally in all profits, and shall be obligated to bar equally any loses, of said business. "4. Each party hereby contributes to the capital of said partnership his or her undivided one-half interest in the "Business Assets" more particularly listed and described in Schedule A attached hereto and made a part hereof, and also covenants and agrees to contribute to the capital of said partnership, as and when collected, his or her one-half of the net proceeds from the collection of each of the Claims or Accounts Receivable more particularly listed and described in Schedule B attached hereto and made part hereof. "5. The parties hereto agree that the partnership hereby formed shall and it does hereby assume and covenant to pay, each of the Business Liabilities more particularly listed and described in Schedule C attached hereto and made part hereof, for the payment of which liabilities each of the parties hereto is equally liable. "6. The ownership of the parties hereto in the assets and property of said partnership shall be as tenants in common, and upon termination of such partnership each party shall share equally in the remaining assets and *126 property of such partnership in eventual liquidation. "WITNESS the due execution hereof by the parties hereto. "WITNESS: (Sgd) Bertha M. Reutzel (Sgd) Peter F. Loftus (SEAL) (Sgd) Bertha M. Reutzel (Sgd) Mary H. Loftus (SEAL)" SCHEDULE A BUSINESS ASSETS
Cash in Bank
$ 1,205.82
Savings Account
5,854.62
Brookville Title and Trust Company
1,120.74
Petty Cash
25.00
Loans and Advances
1,495.52
Equipment Account
300.00
Office Equipment and Books
$ 6,638.85
Professional Equipment
3,372.80
Automobile
1,975.00
$11,986.65
Less
Depreciation to 12-31-38
7,553.30
4,433.35
Patents
265.50
$14,700.55
SCHEDULE B CLAIMS OR ACCOUNTS RECEIVABLE
Ambridge Water Department - Rate Case
$ 1,328.34
Associated Gas and Electric Company - Miscellaneous from 9-1-38
13.77
Canadian Collieries Company - 1938 Contract
1,250.00
City of Cleveland #2
683.35
City of Cleveland #3 - New and Old Office
(Billing plus December Cost)
74,272.95
City of Cleveland #4 P.W.A.
2,354.01
Erie County Electric Company
500.00
Ferncliff Coal Company
950.00
Henderson Coal Company
25.00
City of Lockport
500.00
Laurelton State Village
1,218.92
Monongahela West Penn Public Service Company - Miscellaneous from 5-1-38
357.66
Nanaimo Duncan Utilities
5,214.60
Ohio Edison Company
230.62
Ohio Power Company
666.67
Ohio Public Service Company
50.00
Pennsylvania Coal and Coke Company - From 2-22-38
1,483.07
Pennsylvania Training School #3
2,074.21
Pennsylvania Training School #4
2,198.51
Shawmut Mining Company
1,100.00
Shawmut Mining Company #3
351.97
Borough of Sharpsburg - Boiler Project
2,335.20
Borough of Sharpsburg - Outside Customers
820.44
Borough of Sharpsburg - Power Building
1,181.53
Borough of Sharpsburg - Turbine Project
3,719.21
Tri-State Clay Products Company
150.00
Tarentum Paper Company
1,000.00
Tarentum Paper Company - Advisory
1,188.29
West Penn Power Company - Miscellaneous
106.99
Westinghouse Electric and Manufacturing Company
3,876.19
Western Penitentiary
1,562.47
Warren, Ohio
12,000.00
$124,763.97
*127 SCHEDULE C BUSINESS LIABILITIES
Notes to Mellon National Bank
$ 9,900.00
Specification Deposits
55.00
$ 9,955.00
Accounts Payable: American Mining Congress
$ 10.00
Better Business Bureau of Pittsburgh
5.00
Engineers' Society of Western Pennsylvania
20.00
Postal Telegraph-Cable Company
.63
Pittsburgh Business Properties, Inc.
250.00
Pittsburgh Business Properties Inc.
225.00
Pa. Society of Professional Engineers
8.50
Salzmann & Hamlin
14.00
Wahrenburg, L.E.F. (University Club)
27.50
Hotel William Penn
8.90
569.53
$10,524.53
Simultaneously with the execution of the partnership agreement there was executed an assignment between petitioner and his wife. It was prepared by petitioner's attorney and auditor, dated January 3, 1939, and provided: "ASSIGNMENT AGREEMENT" "MADE the Third day of January, 1939, by and between PETER F. LOFTUS, of the Township of Mt. Lebanon, Allegheny County, Pennsylvania, hereinafter called the 'First Party.' AND "MARY H. LOFTUS, of the same place, hereinafter called the 'Second Party.' WITNESSETH "That for and in consideration of the sum of Sixty-four Thousand Four Hundred Seventy Dollars ($64,470.) to be paid *128 to the First Party by the Second Party, as hereinafter provided, as well as in consideration of the respective covenants and agreements hereinafter set forth, the First Party does hereby sell, assign, transfer and set over unto the Second Party: (a) An undivided one-half interest in and to those certain "Business Assets," more particularly listed in Schedule A, attached hereto and made part hereof at their respective "book values" on the books of the First Party as of December 31, 1938, in the aggregate amount of $14,700.55. (b) An undivided one-half interest in and to those certain Claims or Accounts Receivable owing to the First Party as of December 31, 1938, more particularly listed in Schedule B, attached hereto and made part hereof, in the aggregate amount of $124,763.97. "This assignment is made and accepted under and subject to the following terms and conditions: 1. The Second Party assumes the obligation and covenants to pay one-half of each of the 'Business Liabilities' of the First Party as of December 31, 1938, listed and described in Schedule C, attached hereto and made part hereof, in the aggregate amount of $10,524.53. "2. The aforesaid money consideration of $64,470 *129 shall be payable by the Second Party to the First Party as follows: $4,000, by cancellation of indebtedness owing by First Party to Secondparty as of December 31, 1938; and the balance in ten (10) equal annual installments of $6,047. each, beginning one year from the date hereof, without interest; provided, however, that the last installment (or last several installments, if necessary) of the aforesaid consideration shall be reduced by an amount equal to one-half of any legal or other expenses involved in the attempt to collect any of said Claims or Accounts Receivable listed in Schedule B, and one-half of any of same found to be uncollectible. "3. The undivided one-half interest in said assets hereby assigned to the Second Party shall be held by her as tenant in common with the First Party. "4. The First Party shall cause all of the aforesaid claims or accounts receivable listed in Schedule B to be collected to the best of his ability, applying one-half of the net proceeds of each such collection to the credit or for the benefit of the Second Party in such manner as she may agree to or direct. "WITNESS the due execution hereof by the parties hereto. "WITNESS: (Sgd) Bertha M. *130 Reutzel (Sgd) Peter F. Loftus (SEAL) (Sgd) Bertha M. Reutzel (Sgd) Mary H. Loftus (SEAL)" Schedules A, B, and C referred to in the Assignment Agreement and attached thereto were identical with Schedules A, B, and C, respectively, attached to the Partnership Agreement and set out above. The attorney and auditor who prepared the Partnership Agreement and the Assignment Agreement had not been informed of and did not know of any prior agreement petitioner and his wife may have had with respect to her interest in the business. Petitioner and his wife both regarded the Partnership Agreement and the Assignment as merely a legal device to recognize in form what in substance had long existed. On December 18, 1939, a partnership between petitioner and his wife was registered as such with the Prothonotary of Allegheny County, Pennsylvania, and on December 21, 1939, was similarly registered with the Secretary of the Commonwealth of Pennsylvania. In the early part of January, 1939, at the direction of J. P. Gardiner, an accountant who had supervised the books of the business since 1935, the books of "Peter F. Loftus, Consulting Engineers" were changed to reflect the creation of a partnership. *131 This was done by adding to the book two capital accounts, one in the name of petitioner, and the other in the name of his wife. No new books were opened as a result of the formal partnership agreement. The books of "Peter F. Loftus, Consulting Engineers" did not, prior to the above changes, reflect either any interest of Mrs. Loftus in that business nor any liability of petitioner to her. In December, 1938, an entry was made crediting the personal account of Mrs. Loftus on the books of "Peter F. Loftus, Consulting Engineers" in the amount of $4,000. A similar amount was debited to the personal account of petitioner. Pursuant to the Partnership and Assignment Agreements quoted above, in January, 1939, $4,000 was debited to the personal account of Mrs. Loftus and credited to the new capital account of petitioner. The personal accounts in the names of petitioner and his wife reflected salary credits and withdrawal debits. These accounts were closed once a year and the balance debited or credited to the respective capital account of the petitioner or his wife. The capital accounts purported to reflect their respective interests in the business. In 1939 petitioner's personal account *132 was credited with sums representing a salary of $6 per hour paid to him for engineering services. It was debited with money withdrawn by him for expenses he incurred for the business, but when he filed expense accounts his personal account was credited with an equal amount. The balance at the end of the year was closed in to his capital account. The personal account of Mrs. Loftus showed no entries in 1939 other than the $4,000 credit previously described. At the end of 1939 the profits of the business were computed after deduction for petitioner's salary, and divided into two equal parts, one share then being credited to the capital account of petitioner and the other to the capital account of his wife. In 1940 the Partnership Agreement was changed by an oral understanding between petitioner and his wife. By the terms of this agreement Mrs. Loftus was to receive an annual salary of $7,500, and petitioner was to receive an equal amount in lieu of the previously agreed upon $6 per hour. The books reflected this agreement and the personal account of each was credited with $7,500. At the end of the year the profits of the business after deduction of salaries and expenses were computed *133 and one-half was credited to the capital accounts of petitioner and his wife, respectively. At the same time the balances in their personal accounts were closed into their respective capital accounts. As a result Mrs. Loftus' capital account in 1940 was credited with $5,786.76, the balance in her personal account after withdrawals of $1,713.24. As in 1939 the balance in petitioner's personal account at the end of the year was debited to his capital account. In 1939 the debit balance was $1,010.71, and in 1940 it was $3,374.90. This had resulted from withdrawals in excess of petitioner's salary. Petitioner's withdrawals did not bear any relation to his share in the purported partnership profits. He would withdraw from the business what he needed. Similar debits and credits were made to the capital and personal accounts of petitioner and his wife, respectively, in 1941. Beginning in 1940 and thereafter in each year to the time of the hearing, the capital account of petitioner's wife was debited in the amount of $6,047 and this amount was credited to the capital account of petitioner. The purpose of these entries was to carry out the terms of the previously described Assignment Agreement *134 of 1939. Petitioner reported these amounts as ordinary income. On January 1, 1939, the credit balance of petitioner's capital account was $76,000. This figure included securities considered by petitioner to be his personal property. These were withdrawn as of January 1, 1940, leaving a credit balance in the account of $7,600. Mrs. Loftus understood that by the terms of the Partnership Agreement which she had with her husband she was free to withdraw at any time any amount credited either to her personal account or to her capital account. She did not, however, withdraw her full salary or any amount from her capital interest in either of the years in question because she felt the capital was needed in the business. Prior to 1922 petitioner and his wife had had two children, but both of these had died prior to the opening of the business in Timblin and from 1922 to the time of the hearing they were childless. In 1939 and 1940 partnership tax returns were filed and petitioner and his wife each filed separate income tax returns, each reporting a share of the profits of the alleged partnership. The deficiency notice asserts that in a partnership return filed for 1939 net income of $44,421.03 *135 was reported, while in a similar return filed for 1940 net income of $28,921.83 was reported. In the original petition it was stated that prior to 1939 "petitioner operated a consulting engineering business as a sole proprietorship under his own name. As of January 1, 1939, he formed a partnership with his wife, Mary H. Loftus, to carry on the business formerly conducted by him." In an amended petition it was first stated that petitioner's wife had an interest in the business prior to 1939. Respondent determined that no partnership recognizable for purposes of the Federal income tax was in existence during 1939 and 1940, the years here in question. Opinion In several respects the present facts are at least as favorable to petitioner's contention, that a partnership cognizable for Federal income tax purposes existed between him and his wife, as they were in , and . The initial capital of the business was contributed equally or more by the wife. She participated in the venture from its inception, devoting all her time and energy to it, particularly in the earlier years. *136 She withdrew nothing. That it prospered and expanded, cannot but be attributed in part to her contribution of both capital and services, so that when the formal partnership was created covering the tax years in issue, there was in these respects no reason why her interest should not be recognized and no ground for characterizing the arrangement as a purely fictitious or colorable transaction. The difficulties are first, that the formal partnership agreement failed to give effect to this prior interest and purported to treat the wife's share as part gift and part purchase; and second, that the character of the business, - that of consulting engineer, - raises the question whether its earnings were purely personal to the husband and hence incapable of effective assignment for tax purposes. In cases of this sort we look to reality rather than theory - to the substance rather than the form. From this viewpoint, the situation is the reverse of some recently considered. Here the participation of the wife was real, the disregard of it in the formal recitals was the fiction. We are told this arose from ignorance of the facts on the part of the scriveners; but in any event, its importance *137 would lie only in a clarification of doubtful facts. Here there is no real controversy as to the extent of the wife's contribution, and there can be none as to the ultimate legal purport of the agreement. The wife was a business woman, not a housewife. Cf. . Since she had actively participated in the past, there was little significance to the lack of contemporaneous change in the practical relationships. Cf. If anything was needed to create a partnership it was a change in the wife's legal status. This the agreement supplied. Any assumption - which the parties deny - that her interest would remain intact would be founded on the continuity of past practise, not on the creation of a new situation arising from a qualified and conditional arrangement. Cf. ; . If it be said that only in a family relationship could such circumstances arise, the statement here would relate to the *138 wife's uncompensated interest rather than to the gratuitous and questionable donation of the husband. Cf. ;In spite of a lack of legal niceties, the wife's interest had a substantial and continuing value to which we are required to give effect in considering the economic realities as distinguished from the emotional phases of family affection. ; And if this did not create a technical partnership in the previous years, the distinction is academic, for the existence of a formal written partnership agreement in the period now under review creates the foundation, unlike , for establishing the partnership shares. Thus, the recital of consideration in the partnership agreement, whatever its cause, strikes us as a pure matter of form, and of no significance in the disposition of the questions of substance raised by controversies of this nature. As to the character of the business, the question *139 is far closer. As we said in , "If the earnings of the business were due mainly, though not entirely, to the personal activities and abilities of the petitioner as an electrical engineer * * * we would be required to disregard the arrangement between the petitioner and the members of his family and to tax the income to him as the real earner thereof." We added, however, "if the petitioner would escape the tax on the distributive shares of his partners, we think that he should have shown that his activities and services were not the main factors in the production of the income of the company." While the issue is difficult and somewhat doubtful we have reached the conclusion that on this record petitioner has borne the necessary burden. In three important respects facts appear which were either unfavorable or absent in the Argo case. There, "the services rendered by the petitioner's wife * * * were obviously of negligible importance as an income producing factor." Here, on the contrary, the wife had significant if not indispensible functions in a supervisory, administrative, and advisory capacity. There, we were "not informed *140 as to whether other persons were employed." Here the evidence shows that from twenty to fifty subordinates, mainly engineers, were required to perform the business operations, and that it was sasumed the work could be continued without interruption by them under the wife's control in the event of the petitioner's incapacities. The wife's participation in spite of a lack of professional training is evidently within the contemplation of the Pennsylvania statute covering such partnerships, and, indeed these statutory provisions account for and justify the conduct of the business in the petitioner's name. Act of 1927, P.L. 820, Sec. 8. Finally this substantial payroll was largely responsible for the need for working capital, which the facts show was upward of $100,000. Wages had to be paid in advance of the payment from clients, which is at once demonstrated by, and the occasion for, the large item of accounts receivable forming the bulk of the partnership assets. Making a comparison analogous to that in , the partnership income averaging $36,000 for the two years before us was thus a return of approximately 30 percent on the partnership *141 net worth of about $130,000. The latter figure is considerably higher than in M. M. Argo. On the other hand, the salary fixed for petitioner of $6 an hour was lower in relation to total partnership income than that of petitioner in the Argo case, while overhead, principally payroll, was $15,000 to $20,000 a month. Without suggesting that the importance of invested capital as opposed to personal services is shown by these figures, and without intimating that petitioner's salary correctly established the value of his personal services, we yet cannot say on these facts as we did in M. M. Argo that petitioner has failed to demonstrate the importance to the business of the capital investment and payroll. We conclude that the circumstances involved in these proceedings taken as a whole sufficiently establish that the income in question was for tax purposes partnership income and that petitioner is chargeable with only that portion of it which represents his distributive share. Decision will be entered under Rule 50.